IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| ERIC PITRE, RICHARD NORTHCUTT and RICHIE AINSWORTH, on behalf of themselves and all others similarly situated, Plaintiffs | § § § § § | |
| VS. | § § | C.A. NO. _18-2484_____ |
| | § | CLASS ACTION |
| GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS, LLC and GENERAL MOTORS, LLC, Defendants. | § § § § | |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

## INTRODUCTION

1.    Defendant **GENERAL MOTORS COMPANY** and its wholly owned subsidiaries, including Defendants **GENERAL MOTORS HOLDINGS, LLC** and **GENERAL MOTORS**, **LLC**, collectively referred to as "GM" and "General Motors", is one of the world's largest automakers and currently the number one seller of pickup trucks and full-size SUVs in the United States.[1] Its mission statement: "To Earn Customers for Life." Part of this avowed mission includes GM's "Commitment" to "assign the highest priority to matters that impact our customers' well-being and quality of life" and "to maintain the highest quality standards."[2] As the President of General Motors, Mary Barra,

---

[1] Press Release, General Motors, Three-peat: Chevrolet's Retail Share Grows For Third Consecutive Year - - Up 1 Point Since 2015; (January 3, 2018). http://media.gm.com/content/dam/Media/gmcom/investor/2018/jan/GM-Dec-2017-US-Sales-Release.pdf (last viewed January 8, 2018).

[2] General Motors' mission statement and "Our Commitment" can be found at https://www.gm.com/company/about-gm.html (last viewed December 19, 2017).

said on June 5, 2014, in the wake of the Valukas Report regarding the GM ignition switch issues: "Our job is clear. To build high quality, safe vehicles."[3]

2.    Unfortunately, rather than adhering to its own mission statement, its written commitment to customers and its President's public declaration, General Motors designed, manufactured, marketed and distributed a line of pickup trucks and full-size SUVs with a defective air conditioning system (hereinafter "Class Defect") and concealed the existence and exact nature of the Class Defect from owners, lessees and prospective customers. On information and belief, the vehicles with the Class Defect include the 2015 to 2017 model Cadillac Escalade and Escalade ESV; the 2015 to 2017 model Chevrolet Suburban; the 2015-2017 model Chevrolet Tahoe; the 2014 to 2017 model GMC Sierra 1500; the 2015/2016 model GMC Sierra Heavy Duty; the 2014 to 2017 model Chevrolet Silverado 1500 and the 2015/2016 model Chevrolet Silverado Heavy Duty (hereinafter "Class Vehicles"). Not only did Defendants design, manufacture, market and distribute the Class Vehicles with a defective air conditioning system, but its own documents show General Motors was aware of the Class Defect and neither warned prospective customers nor alerted those who had already purchased or leased Class Vehicles to the problem. This defect in the air conditioning system and GM's conduct form the basis of this class action lawsuit.

3.    Plaintiffs and class members are among the General Motors' customers who purchased or leased Class Vehicles. They, and all others similarly situated, were misled by General Motors' misrepresentations, deceived by GM's failure to disclose the Class Defect and harmed by the defective air conditioning system designed and installed

---

[3]http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/060514-mary-remarks.html/

by Defendants in the Class Vehicles. Plaintiffs bring this class action lawsuit both individually and on behalf of all persons who purchased or leased General Motors' Class Vehicles with the Class Defect in the State of Louisiana.

## PARTIES

### *Plaintiff Eric Pitre*

4.     Plaintiff Eric Pitre is a resident of Reeves, Louisiana and a citizen of the State of Louisiana. Eric works as a salesman at a custom truck shop. He is not a scientist, metallurgist or engineer, and has no special knowledge or experience in the design, manufacture, distribution or marketing of vehicles, although he is a good automotive mechanic.

5.     In or about July 2015 Pitre purchased a new 2015 GMC Silverado, VIN 3GCPCREC5FG242896, from Billy Navarre Chevrolet in Lake Charles, Louisiana. His Silverado was thereafter registered in the State of Louisiana during the time he owned it. Mr. Pitre was to be the regular driver of the pickup, and he wanted a safe, dependable, durable, comfortable, and well-engineered means of transportation.

6.     Mr. Pitre has driven General Motors pickups for many years and in making that decision he has relied heavily on representations made in television advertisements by General Motors that its Silverados, and indeed all General Motors pickup trucks, were durable, reliable, high quality, safe and dependable vehicles. He confirmed air conditioning was standard on the Silverado before purchasing it. That fact was important to him because he spends a lot of time in his truck and the Louisiana climate demands an effective car air conditioning system. Prior to purchasing the Silverado he test-drove

the truck and specifically tested the climate control system, especially the air conditioning, to make sure it would meet his needs.

7.    At no time in the test-drive phase did he experience any problems with the air conditioning system and at no time prior to the purchase of his 2015 Silverado was Pitre warned, either verbally or in writing, that the 2015 Silverado had latent defects in its air conditioning system which could cause the system to cease functioning properly without notice. Had Pitre been so advised, he would not have purchased the Silverado, but instead would have purchased a competitor's vehicle or paid considerably less for his vehicle.

8.    Pitre's Silverado developed problems with its air conditioning system in the summer of 2017, approximately two years after it was purchased. At that time the car had over 50,000 miles on it. He was driving down a street two blocks from the Billy Navarre Lake Charles dealership's location when the air conditioning stopped working and shortly thereafter smoke started coming from his car. This was the first problem Pitre had experienced with his Silverado's air conditioning system. He pulled into the dealership to have the car examined. He was advised by a Billy Navarre employee that his condenser had gone out, his compressor had burned up and a belt had broken. The dealership told him that it would take two weeks for them to get the replacement parts and make the needed repairs. Pitre had the pickup towed to Verret Motorsports in Lake Charles, Louisiana, where they charged him $1,500.00 to make the needed repairs. The same day the repairs were finished, Pitre picked up his 2015 Silverado and traded it for a new vehicle.

9.      The defective air conditioning system in Pitre's 2015 Silverado cost him $1500.00 to repair. In addition, he had purchased a truck he would not have bought had he known of the defects in the air conditioning system and he overpaid for his 2015 Silverado because it contained a hidden defect in the air conditioning system. Pitre also incurred the inconvenience of being without transportation while his car was in the shop and suffered a diminution in the value of the Silverado due to the latent defect in the vehicle's air conditioning system. In Louisiana a vehicle with a latent defect in its air conditioning system is worth less than the identical vehicle without such a defect.

*Plaintiff Richard Northcutt*

10.      Plaintiff Richard Northcutt is a resident of Covington, Louisiana and a citizen of the State of Louisiana. Richard works as a superintendent for a commercial construction company that specializes in constructing smaller commercial buildings. He has worked in the construction trades most of his adult life and is not a scientist, metallurgist or engineer. He has no special knowledge or experience in the design, manufacture, distribution or marketing of vehicles.

11.      In late November 2015 Northcutt purchased a used 2014 GMC Silverado, VIN 3GCPCRECXEG254864, from Rainbow Northshore Buick GMC in Covington, Louisiana. At the time of his purchase the Silverado had approximately 10,000 miles on it and was still under the factory "3 Year or 36,000 Mile Warranty". He registered his Silverado in the State of Louisiana and it has remained registered here since that time. Mr. Northcutt was to be the regular driver of the pickup. His job as a construction superintendent often means his vehicle is functioning as his office, and Northcutt wanted a safe, dependable, durable, comfortable, and well-engineered means of transportation.

12.    Mr. Northcutt had previously driven a competitor's pickup, but this time made the decision to purchase a General Motors' vehicle. A significant factor in his decision was General Motors' television advertising he had seen for many years. Specifically, in making his decision to purchase the 2014 Silverado he relied heavily on representations made in GM's television advertisements that the Silverados, and indeed all General Motors pickup trucks, were durable, reliable, high quality, safe and dependable vehicles. One phrase was especially important: that the pickup trucks were "long-lasting". Mr. Northcutt confirmed air conditioning was standard on the Silverado before he went car shopping. That fact was important to him because he spends a lot of time in his truck and the Louisiana climate demands an effective car air conditioning system. Prior to purchasing the 2014 Silverado he test-drove the vehicle and specifically tested the climate control system, especially the air conditioning, to make sure it would meet his needs.

13.    At no time in the test-drive phase did he experience any problems with the air conditioning system and at no time prior to the purchase of his 2014 Silverado was Northcutt warned, either verbally or in writing, that the 2014 Silverado had latent defects in its air conditioning system which could cause the system to cease functioning properly without notice. Had Northcutt been so advised, he would not have purchased the Silverado, but instead would have purchased a competitor's vehicle or paid considerably less for his vehicle.

14.    Northcutt first developed problems with the air conditioning system in his 2014 Silverado in late December 2016, when the air conditioning ceased blowing cold air. On December 27th he took the Silverado to the Firestone Complete Auto Care facility in

Mandeville, Louisiana. At that time the car had 41,322 miles on it. The repair facility diagnosed the problem as being due to a failed condenser and removed and replaced the condenser. The cost of these repairs, as well as recharging the air conditioning system, totaled approximately $1,175.00. At the time of this repair no one advised Northcutt of a latent defect in the air conditioning system of all Silverados or across several lines of General Motors vehicles. Northcutt assumed it was just his bad luck that the condenser had failed, and he continued driving the Silverado for the next year, without problems with the air conditioning system.

15.    In late January 2018 the air conditioning of Northcutt's Silverado ceased to function again. At that time the Silverado had slightly more than 69,000 miles. He took his pickup back to the Firestone Complete Auto Repair Center on January 26th and complained that his air conditioning system was not blowing cold air and that it was leaking fluid again. The next day the Repair Center diagnosed a failed compressor and replaced the compressor and recharged the system. Northcutt was charged $949.11 for the repair and replacement. Northcutt picked up his car on the 28th and was back at the repair center on February 1, 2018, with a non-functioning air conditioning system that was again leaking fluid. This time the mechanics at the Repair Center determined the problem on January 26th had not been due to a faulty compressor, but rather was due to a failure of the compressor to condenser hose. The line had cracked and leaked refrigerant onto the compressor, giving the impression the cause of the air conditioning system not working was a compressor failure. The mechanics at the Firestone service center replaced the compressor to condenser line, installed a bracket and recharged the system. The Firestone Complete Auto Repair Center also partially refunded Mr. Northcutt monies

he had paid to replace the condenser. At the end Mr. Northcutt paid $295.03 to repair the compressor to condenser hose, install the new bracket and recharge the system. In total Northcutt paid almost $1,500.00 for the two repairs to his air conditioning system.

16.     The defective air conditioning system in Northcutt's 2014 Silverado cost him almost $1,500.00 to repair. In addition, he had purchased a truck he would not have bought had he known of the defects in the air conditioning system and he overpaid for his 2014 Silverado because it contained a hidden defect in the air conditioning system. Northcutt also incurred the inconvenience of being without transportation while his car was in the shop and has suffered a diminution in the value of his Silverado due to the latent defect in the vehicle's air conditioning system. In Louisiana a vehicle with a latent defect in its air conditioning system is worth less than the identical vehicle without such a defect.

17.     When his condenser problem occurred in December of 2016, Richard Northcutt just assumed he had been unlucky. No one told him there was a condenser failure that represented a systemic failure and he had no reason to attempt to ascertain whether there was some type of latent defect in the air conditioning system of the Silverados. When he had his second air conditioning problem in late January 2018, Northcutt began to search the internet to see if he could determine what was going on with the air conditioning systems of the Silverados. That was when he learned, for the first time, of the Class Defects present in the Class Vehicles.

*Plaintiff Richie Ainsworth*

18.     Plaintiff Richie Ainsworth is a resident of Slidell, Louisiana and a citizen of the State of Louisiana. Richie works as an accountant and is not a scientist, metallurgist

or engineer. He has no special knowledge or experience in the design, manufacture, distribution or marketing of vehicles.

19.    In October 2016 Ainsworth purchased a used 2014 GMC Silverado, VIN 3GCPCSEC2EG168701, from Musson Patout automotive group in New Iberia, Louisiana, an authorized Buick GMC dealership. At the time of his purchase the Silverado had approximately 45,000 miles on it. Ainsworth registered his Silverado in the State of Louisiana and it has remained registered here since that time.

20.    Mr. Ainsworth was to be the regular driver of the pickup and he wanted a safe, dependable, durable, comfortable, and well-engineered means of transportation. A significant factor in his decision was the General Motors television advertising he had seen for many years. Specifically, in making his decision to purchase the 2014 Silverado he relied heavily on representations made in GM's television advertisements that the Silverados, and indeed all General Motors pickup trucks, were durable, reliable, high quality, safe and dependable vehicles. Mr. Ainsworth confirmed air conditioning was standard on the Silverado before he went car shopping. That fact was important to him because Louisiana climate demands an effective car air conditioning system. Prior to purchasing the 2014 Silverado he test-drove the vehicle and specifically tested the climate control system, especially the air conditioning, to make sure it would meet his needs.

21.    At no time in the test-drive phase did Ainsworth experience any problems with the air conditioning system and at no time prior to the purchase of his 2014 Silverado was he warned, either verbally or in writing, that the 2014 Silverado had latent defects in its air conditioning system which could cause the system to cease functioning properly

without notice. Had Richie Ainsworth been so advised, he either would have purchased a competitor's vehicle or paid considerably less for the Silverado.

22.     Ainsworth first developed problems with the air conditioning system in his 2014 Silverado in January 2017, when the air conditioning began blowing hot air. On January 17th he took the Silverado to the Automotive Center of Slidell for evaluation and repair. At that time the car had 49,529 miles on it. The repair facility diagnosed the problem as being caused by a failed compressor to condenser hose. The hose was removed and replaced, a hose bracket was installed, and the system was recharged with refrigerant.  The cost of these repairs totaled $453.18.

23.     In late December 2017 or the first of 2018 the air conditioning system in Ainsworth's Silverado ceased functioning properly again. In February 2018, when his Silverado had 60,752 miles on it, Ainsworth took the car back to the Automotive Center of Slidell. There his car was diagnosed as having a leak in the condenser due to a failed weld. He authorized the repair shop to replace his leaking condenser and to recharge the system with refrigerant. Ainsworth's total repair cost for this repair was $893.63.

24.     The defective air conditioning system in Ainsworth's 2014 Silverado cost him $1,350.00 to repair. In addition, he had purchased a truck he would not have bought had he known of the defects in the air conditioning system, and he overpaid for his 2014 Silverado because it contained a hidden defect in the air conditioning system. Ainsworth also incurred the inconvenience of being without transportation while his car was in the shop and suffered a diminution in the value of his Silverado due to the latent defect in the vehicle's air conditioning system. In Louisiana a vehicle with a latent defect in its air conditioning system is worth less than the identical vehicle without such a defect.

*Defendants*

25.    Defendant General Motors Company is a Delaware corporation with its principal place of business in Michigan. Defendant can be served with citation and a copy of Plaintiffs' Original Class Action Complaint by serving its registered agent for service of process: Corporation Service Company; 251 Little Falls Drive, Wilmington DE 19808.

26.    Defendant General Motors Holdings, LLC is a Delaware limited liability company with its principal place of business in Michigan. Based on information and belief, the sole member of General Motors Holdings, LLC is General Motors Company. Defendant can be served with citation and a copy of Plaintiffs' Original Class Action Complaint by serving its registered agent for service of process: Corporation Service Company; 251 Little Falls Drive, Wilmington DE 19808.

27.    Defendant General Motors, LLC is a Delaware limited liability company with its principal place of business in Michigan. Based on information and belief, the sole member of General Motors, LLC is General Motors Holdings, LLC and the sole member of General Motors Holdings, LLC is General Motors Company. Defendant General Motors, LLC can be served with citation and a copy of Plaintiffs' Original Class Action Complaint by serving its registered agent for service of process: Corporation Service Company; 501 Louisiana Avenue, Baton Rouge LA 70802.

## JURISDICTION AND VENUE

28.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A) because this is a class action as defined by 28 U.S.C. §1332(d)(1)(B), in which the amount in controversy exceeds $5,000,000.00 exclusive of costs of interests and in which a member of the class of plaintiffs is a citizen of a State different from Defendants.

29.     This Honorable Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because this is an action between citizens of different States where the amount in controversy exceeds $75,000.00.

30.     This Honorable Court has personal jurisdiction over Defendants. This case arises out of contacts Defendants have with Louisiana. All three Defendants conduct substantial business in Louisiana and this suit arises out of Defendants' actions which took place in the State of Louisiana. At all times material to this case Defendants were engaged in the marketing, sale and distribution of Class Vehicles in the State of Louisiana. This cause of action arose from, or is connected with, purposeful acts committed by GM in Louisiana, including the sale in Louisiana of thousands of Class Vehicles. Alternatively, GM conducted substantial and/or continuous and systematic activities in the State of Louisiana such that all Defendants are "essentially at home" here, and exercising jurisdiction over Defendants is reasonable.

31.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because each Defendant is a "resident" of the Eastern District of Louisiana and a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Louisiana. As discussed above, Defendants conduct substantial business in Louisiana and have intentionally availed themselves of the laws and markets of the United States and Louisiana. Additionally, by definition, the purchases of Class Vehicles occurred in Louisiana and many Class Vehicles are located here.

## FACTUAL ALLEGATIONS

### *How Car Air Conditioning Systems Function*

32.    Almost all modern automobile air conditioning systems function in basically the same fashion: they cool the passenger compartment of the vehicle by blowing ambient air over a cold evaporator and into the passenger space. The evaporator is cooled by a chemical reaction involving an inert gas (typically r134a).[4] This gas (referred to in this pleading as a "refrigerant") circulates in a sealed system through various components that either pressurize or depressurize and heat or cool the refrigerant until it reaches the necessary temperature to allow the evaporator to become cold enough so the air blown through the evaporator will turn cold and cool the interior of the car. The key to a functioning air conditioning system is for the system through which the refrigerant circulates to remain sealed or closed. If a leak develops in the system, the refrigerant will escape, the evaporator will not cool down and the air blown across the evaporator will not turn cold and cool the interior of the car. Additionally, if the refrigerant leaks out of the closed system, it leaves other components of the system at risk for seizing up and failing.

33.    In order to more fully understand the Class Defect, it is useful to examine a typical car's air conditioning system in more detail. The diagram below shows a typical vehicle air conditioning system.

---

[4] Many often refer to the inert gas used as a refrigerant in car air conditioning systems as "freon". This is like referring to copying machines as "xeroxes". Freon is actually a registered trademark of The Chemours Company, which uses it for a number of halocarbon products designed to help cool interiors.



34.    The system is designed to allow the refrigerant to pass through a series of chemical reactions in order to reach the temperature and pressure necessary to cool the evaporator. The first stop for the refrigerant in this process is the compressor. The compressor is a belt driven pump responsible for compressing the refrigerant and pumping it to its next stop. The compressor accomplishes its purpose by drawing into the suction side of the compressor refrigerant that is in a liquid, low-pressure, moderate temperature state and compressing the refrigerant into a high pressure, high temperature gas. The compressor then pumps the refrigerant in its gaseous state through a line to the condenser.

35.    The condenser resembles and functions like a radiator. The hot, compressed refrigerant in a gaseous state comes through the compressor to condenser line and enters the top, or high side, of the condenser. In the condenser the refrigerant is

-14-

cooled. As it cools, the refrigerant condenses and ultimately exits the condenser as a high-pressure liquid. The cooled liquid refrigerant flows from the condenser through a line into the drier.

36.    The drier has two functions: (1) it "dries" the refrigerant (inside the drier is a desiccant bag that absorbs any moisture that may have contaminated the refrigerant) and (2) it stores the liquid refrigerant until needed.

37.    After the drier the refrigerant flows through another line to the expansion valve. The high-pressure liquid enters the expansion valve, where an internal valve allows only a limited, controlled portion of the refrigerant to exit and enter the evaporator. This internal control over the passage of the refrigerant allows the higher temperature fluid to cool by keeping the pressure low. This now low-pressure refrigerant flows through a line from the expansion valve into the vehicle's evaporator.

38.    The evaporator, as its name suggests, evaporates. When the low-pressure refrigerant enters the evaporator, it starts to boil, changing from a liquid back into a gas. As it boils it absorbs heat, including heat from the physical structure of the evaporator itself. This causes the evaporator to become very cold. Meanwhile, the air conditioning system's blower motor and fan are pushing air across the cold evaporator. This passage converts to ambient temperature air into the chilled air that enters the passenger compartment. The compressor, in the meantime, draws in the low-pressure refrigerant from the evaporator, and the cycle starts again.

### The Class Vehicles

39.    The Class Vehicles involved in this case include:

- Cadillac Escalade and Escalade ESV, model years 2015 to date;

- Chevrolet Suburban, model years 2015 to date;

- GMC Yukon and Yukon XL, model years 2015 to date;

- Chevrolet Tahoe, model years 2015 to date;

- GMC Sierra 1500, model years 2014 to date;

- GMC Sierra Heavy Duty, model years 2015/2016;

- Chevrolet Silverado 1500, model years 2014 to date; and

- Chevrolet Silverado Heavy Duty, model years 2015/2016.[5]

40.    Based on information and belief, the Class Vehicles are all built on a single vehicle platform, referred to internally at General Motors as GMT K2XX,[6] and the air conditioning systems in these Class Vehicles share the same design. Based on information and belief, over 2 million Class Vehicles have been sold in the United States.[7]

---

[5] http://gmauthority.com/blog/gm/gm-platforms/k2xx/ (last viewed December 20, 2017).

[6] *Id.*

[7]http://media.gm.com/dld/content/Pages/news/us/en/2017/jan/0104-gmsales/_jcr_content/rightpar/sectioncontainer_0/par/download_0/file.res/Deliveries-December-2016.pdf; http://media.gm.com/dld/content/Pages/news/us/en/2016/jan/0105-gmsales/_jcr_content/rightpar/sectioncontainer_0/par/download_0/file.res/GM-Deliveries-December-2015.pdf; http://media.gm.com/dld/content/Pages/news/us/en/2015/Jan/gmsales/_jcr_content/rightpar/sectioncontainer_0/par/download_0/file.res/Deliveries-December-2014.pdf;    and http://media.gm.com/dld/content/dam/Media/gmcom/investor/2014/jan/Deliveries-December-2013.pdf

### *The Condenser in the Class Vehicles*

41.    As described above, the condenser in the air conditioning system of cars functions as a heat exchanger. Refrigerant enters the condenser hot and is cooled there. In Class Vehicles the condenser serves as more than a heat exchanger for the refrigerant in the air conditioning system. According to General Motors, the condenser is a "combination transmission fluid/oil and AC condenser cooler." This means the condenser has multiple lines running into and out of it, carrying different fluids at different temperatures, and there is a significant amount of heat exchange taking place.

### *The Class Defect in the Air Conditioning System*

42.    The defect in Class Vehicles is that components of the air conditioning system fail during normal, everyday use, allowing refrigerant to leak out. The absence of refrigerant prevents the evaporator from becoming cold, causing the system to blow hot air into the car's passenger compartment and, in some cases, causing other parts of the system to fail. Based on information and belief, there are at least two defective components, and there may be more.

43.    The first defective component is the line leading from the compressor to the condenser. This line consists primarily of an aluminum tube connected to a rubber hose. On information and belief, this line can fail in two ways. First, the aluminum tube can become disconnected from the rubber hose, creating an opening in the line that can allow refrigerant to escape. Second, the aluminum tube itself has a material defect that can allow the tube to rupture, also allowing refrigerant to escape.

44.    GM has recognized this defect. It no longer manufactures the compressor to condenser line that was original equipment in the Class Vehicles. Instead, in Technical

Service Bulleting number PIT5331, dated October 6, 2014, General Motors instructed mechanics that if they find a failure in this line, they are to replace it with a newly designed line and install a bracket in the system to minimize flexion and movement of the compressor to condenser line. (Exhibit A). Unfortunately, customers who suffer this failure after the vehicle is out of warranty are required to purchase and pay for the installation of these new parts, thus having to pay twice to obtain a functioning air conditioning system. Further, Bulletin #PIT5331 did nothing to protect owners and lessees who had not yet suffered catastrophic failure of their system. They were not even advised of the existence of this latent defect. Finally, subsequent potential purchasers or lessees of the Class Vehicles were not warned of the Class Defect.

45.    The second defective component in the air conditioning system of the Class Vehicles is the condenser itself. On information and belief, the original condenser has a material defect that renders it unable to withstand the day-to-day normal operation of Class Vehicles. On information and belief this defect is most likely due to: (i) the use of an inadequate material to build the condenser, (ii) the use of an insufficient amount of material in the manufacture of the condenser and/or (iii) inadequate welds.

46.    It appears General Motors recognizes the condenser installed as original equipment in the Class Vehicles is defective. In "November 2017" General Motors mailed a notice to some, but not all, owners of certain Class Vehicles advising their particular model "may have a condition where thermal cycling on the combination transmission fluid/oil and AC condenser cooler creates a crack that may allow refrigerant to escape. This condition consequently may deactivate the AC system…." Thermal cycling causing a crack is another way of saying: the design of the condenser is defective because it lacks

the tensile strength, for whatever reason, to withstand the day-to-day demands of expansion and contraction caused by use of the air conditioning system.

47.    The Class Defect existed at the time the Class Vehicles left the possession of General Motors.

48.    While some of the Class Defects manifested themselves within the warranty period of 3 years or 36,000 miles whichever comes first, many of the defects, such as those in the Plaintiffs' Class Vehicles, did not, leaving the owners unable to obtain reimbursement from General Motors for their repair costs.

### *The Class Defects Create Safety and Health Dangers*

49.    Obviously lack of air conditioning affects the comfort and well-being of drivers and passengers in Class Vehicles. It also poses a safety hazard, especially in the summer months. For example, one owner reported being involved in an accident because of the air conditioning defect:

> I have a 2014 Chevy Silverado **air conditioner went out almost got in a very bad accident it was extremely hot outside** had just got off work started driving down the road and **got real dizzy and lightheaded and ended up running into a pole on the side of the road I'm very lucky.** That is the only thig I ran into I need to get this problem fixed fast before something gets hurt bad.[8]

Two owners expressed concerns for the safety of their children on carproblemzoo.com:

> Vehicle started to blow hot air when air conditioner was on. Brought this in to get it fixed twice and last time we were informed that there is a hole in the condenser and that gm is trying to find a manufacturer for the part but have no timetable as to when the part will be available. We also called gm and they confirmed that there is an issue but have no timetable on when this will be fixed. They were working with one manufacturer that hasn't been able to produced the

---

[8]    https://www.torquenews.com/3768/owners-2014-chevrolet-silverados-are-hot-about-ac-problems?page=3 (emphasis added) (last viewed December 22, 2017).

part so now they are working with another manufacturer. **For the safety of my children, this is unacceptable**.[9]

I was informed that the [2015 Tahoe] air condenser is a faulty part and is not working on my vehicle. Also, GM has knowledge of this issue, for it is a known issue with Chevrolet Tahoe. The part to fix this problem is on back order, and there are no parts in production, for they have not come up with a remedy to replace the faulty part. Therefore, I do not have air conditioning within my vehicle. **Thus, causing a safety issue, for it is 90 degrees where I live, and I have infant twins that are transported with my vehicle.**[10]

These complaints were echoed by "bridegroom", who noted in his post:

I have been waiting to get my air conditioner fixed now for months and I keep getting told there are no Condensers available. I have talked with service writers at GM dealership's well as other Sierra owners and they all have the same problem for the most part.

This needs to be put on a recall list or I have decided to file a class action lawsuit in this matter regarding all Sierra owners across the country.
**I, as well as I am sure other people, have serious breathing issues in hot weather and need my truck fixed promptly**.[11]

50.    In addition to safety problems posed by exposure to excessive heat in a car, the Class Defect creates a hazard when the climate control system is used to defrost/defog the front windshield. Without a functioning condenser, the defrost/defog modes of the climate control system will not function. This leaves the driver potentially unable to see out of the front windshield. That is what happened to the following driver, who complained to the National Highway Transportation Safety Administration.

---

[9]    www.carproblemzoo.com/gmc/yukon/2015/air-conditioner-problems.php    (emphasis added) (last examined December 22, 2017).

[10]        http://www.carproblemzoo.com/chevrolet/tahoe/air-conditioner-problems.php (emphasis added) (last examined December 24, 2017).

[11]https://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/AC_not_working.shtml (emphasis added) (last viewed on December 23, 2017).

> GM condenser issue. GM has a known issue with 2014-16 [Tahoes] using a defective condenser. They have a new part# that is on national backorder and are unwilling to do anything for their customers waiting for the part. I was driving down the freeway, kids in tow on a rainy, muggy day…**My windshield began to fog and with no condenser to run the AC I was unable to [de-fog] my windows.** Unable to see a thing, I had to pull over, on the freeway, carefully, and find a child's coat in the very ack to wipe down the windows to [get] visibility. **This is a safety issue and clearly negligence on GM's part and they would be liable if/when this creates a serious accident.**[12]

51.    Finally, the defects in the air conditioning system could pose a safety problem if the system fails while the Class Vehicles are in operation. Such a failure could cause the driver to become distracted while he or she adjusts the climate control system in an effort to solve the problem.

52.    It is very clear that the defects in the air conditioning systems of the Class Vehicles not only affect the comfort of those in the vehicles, but also pose serious health and safety risks.

### *There Were So Many Defects GM Could Not Repair or Replace the Parts*

53.    A cursory review of the websites cited in this pleading reveals hundreds of complaints about the defective air conditioning systems in Class Vehicles. There were so many complaints the NBC Station in Chicago, Channel 5, investigated. Its report was aired on or about August 9, 2017. In the segment Lisa Parker of "NBC 5 responds" reported:

> Drivers of popular General Motors vehicles nationwide say they are in a fix: the A/C in their newer-model trucks is not working, and repair parts are nowhere in sight. Among the vehicles affected: Chevrolet Silverado, Tahoe and Suburban; GMC Sierra, Yukon and Yukon XL; and Cadillac Escalade and Escalade ESV.

---

[12] NHTSA ODI 1099497 (incident date listed as June 13, 2017) (emphasis added).

NBC 5 Responds found 100 cases recently reported to the National Highway Traffic Safety Administration and scores of other unhappy GM drivers lashing out online. **While General Motors acknowledges the problem and a national backlog on replacement parts, no recall or notice to dealers, called a Manufacturer's Communication, has been issued.**

The situation leaves drivers frustrated, waiting weeks to get their hands on the needed part during the hottest part of the year, and for those whose cars are just out of warranty - - facing repair estimates ranging from $1,100 to more than $4,000.

(emphasis added). After a conversation with one particular family who found their

"condenser hose had cracked", allowing the refrigerant to escape, the reporter noted:

Online, we found plenty of company for the Kuffels [the family whose hose cracked]. Drivers who tell NHTSA they've waited weeks multiple weeks but can't get their hands on needed parts. Some who faced estimates ranging from $1,100 to more than $4,000 to fix it. Many drivers in states with summer temperatures that soared above 100 degrees, afraid to put their kids or their pets in their own vehicles.

Lisa Parker then contacted General Motors, which acknowledged the longstanding

backlog, and responded in writing:

"We are aware of the part constraints of air-conditioning units available for service repairs of some GM full-size utilities. We have resolved the issue with our supply base, and have already doubled the number of parts produced each week for service repairs. We expect to fulfill the back ordered parts by the end of August, prioritizing those customers who have waited the longest for replacements. We apologize for any inconvenience this has caused, and are working with customers on an individual basis to meet their needs."

Parker further reported:

GM confirms the models affected include the Chevrolet Silverado, Tahoe and Suburban; GMC Sierra, Yukon and Yukon XL; and Cadillac Escalade and Escalade ESV, but did not specify which model years.[13]

---

[13] Report posted online on August 10, 2017 found at https://www.nbcchicago.com/news/local/gm-air-conditioning-responds-439572983.html (last viewed December 26, 2017).

54.      Six weeks later, on September 19, 2017, the NBC station in the Dallas-Fort Worth Metroplex, Channel 5, aired the results of its own investigation. Wayne Carter of D-FW NBC 5 Responds was the reporter for the segment, and it was posted online on September 19, 2017. In his investigation he reported that dozens of viewers had complained to the station:

> Is there anything more uncomfortable than driving around without air conditioning during a North Texas summer?
>
> Just a few hours can be brutal, but imagine a few months.
>
> Several General Motors customers have been waiting that long to get the A/C repaired in their vehicles. **Many have complained - - dozens of you to us.** Now, we have some answers.
>
> The problem is happening in some of GM's full-sized SUVs, including the ones made in Arlington. There are 2014 and 2015 Tahoes, Yukons and Silverados - - just a couple of years old - - with air conditioning that has gone bad.

(emphasis added). Then Carter reported on the futility of requesting assistance from GM:

> GM initially told NBC 5 Responds the back-ordered parts would be fulfilled by the end of August. That was nearly three weeks ago. After calling again for an update this week, the GM spokesperson refused to comment.[14]

### General Motors' Documents Reflect Actual Knowledge of these Defects

55.      General Motors' own documents establish GM had actual knowledge of the Class Defect in the Class Vehicles from the beginning of the introduction of the Class Vehicles in the market. Technical Service Bulletin #PIT5331 was issued by General Motors on October 6, 2014 (Exhibit A). It references "the compressor to condenser line"

---

[14] Report posted online on September 19, 2017 at https://www.nbcdfw.com/news/local/Some-GM-Chevy-Chevrolet-GMC-Owners-Have-Lengthy-Wait-for-Air-Conditioning-Repairs-445827893.html (last viewed December 26, 2017).

in early models of the Class Vehicles and notes "[s]ome owners may comment that the

a/c is blowing warm." General Motors goes on to write:

> If, after performing normal diagnostics and the source of the leak is either not found, or it is found at/near the rear of the compressor, it may be caused by a small crack in the compressor to condenser line.

> The compressor to condenser line may have a small crack or pin hole located at the inside radius of the first bend near the compressor, as shown below.



> If the a/c line cracks, it may spray oil and refrigerant onto the a/c compressor, making the leak very hard to identify.

> To repair this condition and prevent it from reoccurring, replace the compressor to condenser line and install the line bracket shown below. After completing the repairs, recharge the refrigerant system and perform a leak test to verify proper operation.

Exhibit A. On information and belief, in order to write this document, General Motors had

to have received such a large number of complaints that it felt the need to investigate the

cause of air conditioning failures, attempt to develop a solution, design new parts, have

the new parts manufactured and write the Technical Service Bulletin. The time it would

take from receipt of the complaints through investigation, to the development and manufacture of the replacement lines and brackets, to the writing and issuance of the Technical Service Bulletin, would indicate that General Motors had actual notice of the air conditioning defects in 2013. *See, e.g. Falco v. Nissan North America, Inc., 2013 WL5575065 at *6 (C.D. Calif. 2013).*

56.    General Motors continued to receive notice of the problems with the air conditioning system in Class Vehicles throughout 2014 and into 2015. General Motors maintains online forums where customers can register complaints about their vehicles directly with GM. A number of complaints about the Class Vehicles were made directly to GM on those forums. For example, on August 4, 2014, "Magnes" posted the following:

> We bought our 2014 Chevy Z71 LTZ 4 Door ½ ton truck [a Chevy Silverado] last June when they first came out. My wife was hell bent on getting on as soon as she saw the new design. We flew from Mississippi to Houston, rented a car, and drove to Austin to pick it up. It's a good looking truck but now that we've had it just over a year, putting some miles on it (almost 34,000), and the warranty is about over with, the AC has gone out on us.
>
> The AC is just blowing hot air. Had been working fine up until this afternoon. The controls all work, the vents change as they should, just no cool air.
>
> Has anyone else had this issue?

He received a response from "Amber N", who identified herself as being with Chevrolet Customer Care. Magnes' post drew a follow-up on August 24th from "Jacobmo", who asked "same issue this morning a/c is blowing HOT air. what was the problem with yours?" Jacobmo's post drew an acknowledgement and reply from "Kristen A." with "Chevrolet Customer Care". That same thread drew subsequent customer complaints on August 31, September 27 and October 7 of 2014, and March 6, March 8, March 10 and

March 30, 2015, all about air conditioning issues on this model vehicle. Almost all these posts received a response from individuals identifying themselves as being with "Chevrolet Customer Care". On May 2, 2015, "TexasTank" weighed in, writing:

> Looks like this is a very common issue and gm needs to own up to this issue! I too had my a/c compressor replaced at 17k miles. Now at 42k miles less then a year on the new compressor "yes i drive allot", my a/c is out again! What is the deal here! I called up the dealer and they supposedly said im out of warranty but since its been less then a year on the new compressor they will have to check with management [sic] this monday coming [sic] up. I hope i don't get the run around bs because im not in the mood.[15]

57.    On May 29, 2015, over one year before the Howards experienced the failure of their air conditioning system, General Motors issued Engineering Information Number PIE0340 regarding "A/C Inoperative or Poor Performance on Recent Built Vehicles" (Exhibit B). This document refers to 2015 models of the Class Vehicles. General Motors starts by observing that "Some customers may comment on the A/C not performing as intended or the A/C not performing at all." Most importantly, GM goes on to state that this air conditioning system problem "may also be noticed during the Pre-Delivery Inspection (PDI) of a vehicle." This can only mean that before May 2015 dealers were reporting air conditioning problems with early model Class Vehicles **before the vehicles could be placed on the sales lot!** There is even more damaging information contained in this document. Under the heading "Cause" General Motors wrote: "GM Engineering is attempting to determine the root cause of the above condition [A/C Inoperative or Poor Performance]." That would indicate that as of the summer of 2015, not only was GM

---

[15]    All quotes found at https://chevroletforum.com/forum/2014-gmtk2xx-110/2014-silverado-ac-problems-already-67170/

aware of the air conditioning system defects in the Class Vehicles, but neither knew the cause of the problems not had developed a solution.[16]

### General Motors' Pre-Release Testing Should Have Revealed the Class Defect

58.    On information and belief, prior to the original release of any model vehicle, including the Class Vehicles, General Motors subjects the designs of the vehicle and its component parts to careful engineering scrutiny and performs extensive testing to ensure the end product meets consumer expectations. On information and belief this evaluation and testing occurs before the first vehicle is released for distribution and sale. During this period prior to the release of the first vehicles, General Motors tests, studies and evaluates how the component parts of all systems, including the air conditioning system, handle ordinary daily use. This pre-release testing data and evaluations, on information and belief, should have revealed the Class Defect prior to the sale of the first Class Vehicle in 2013. Based on information and belief, Defendants knew or should have known of the Class Defect before the introduction of the Class Vehicle onto the market.

### General Motors' Data Immediately Post-Release Should Have Revealed the Class Defect

59.    General Motors tracks consumer complaints and warranty claims made to it and to its dealers, as well as replacement part sales data, from the first day the vehicles are released on the market. Given the time between introduction of the K2XX line of vehicles and the issuance of Technical Service Bulletin PIT 5331, on information and

---

[16] The May 24, 2015 Engineering Information also means the 2014 proposed fix set out in Bulletin #PIT5331, including a new line and a bracket, did not fix the Class Defect. *See,* GM sponsored website http://www.gm-trucks.com/forums/topic/200888-ac-condenser where in response to an inquiry about the bracket, on May 2, 2017, "O_J_Simpson" posted "Won't work. The bracket was not a successful band-aid, I mean fix. GM has a newly redesigned hose in another attempt that is to be used instead of the bracket now." (last viewed December 23, 2017).

belief, Defendants knew in 2013 immediately after the release of the Class Vehicles that there was a defect in the Class Vehicles' air conditioning system.

### General Motors Has Not Yet Developed a Solution to the Class Defect

60.    It appears General Motors has not developed a fix for the Class Defect. "Tootall 29" wrote on the same GM customer website on October 15, 2017:

> Bought a 2017 LT z71 used and the AC worked great for a while, no reports on the car fax that it had been replaced before, but on the way to Texas the other day (moved from Florida where it was bought) it started blowing warm air. And thats all it really does now.[17]

### General Motors' Subsequent Conduct

61.    Despite the fact GM has long had actual knowledge of the Class Defect in the Class Vehicles, it was not until November 2017 that General Motors advised certain owners and lessees of certain Class Vehicles of the Class Defect. Plaintiff was not among those notified. On information and belief, General Motors has not warned potential purchasers or lessees of the Class Vehicles about the Class Defect. Indeed, to the contrary, General Motors has continually promoted the quality, durability and dependability of the Class Vehicles without mentioning the latent defects in the air conditioning system.[18] For example, in its brochure for the 2014 Chevrolet Silverado 1500

---

[17] *See also*, YouTube video posted on May 10, 2017 by mechanic Cesar Vega "2014 GMC SIERRA AC CONDENSER PROBLEM!" noting there is "the exact same problem" with "2013 2014 2015 2016 2017 GMC Sierra Chevy Silverado GMC Yukon [and] Chevy Tahoe," "all have the same AC condenser problem." Vega goes on to conclude GM "need[s] to consider this a recall," at https://www.youtube.com/watch?v=c4f_SgqeOMtl (last viewed December 23, 2017).

[18] This is even though the 2014 Silverado and Sierra had been recalled six times by July 2014 and were referred to as "the year's most frequently recalled vehicles." http://money.cnn.com/2014/07/28/autos/most-recalled-vehicle/index.html

GM describes the vehicle as "Strong. For all the roads ahead" and "Stronger, smarter and more capable than ever." It continues making similar representations in subsequent Silverado brochures, including describing the Silverado as "The most dependable, longest-lasting full-size pickups on the road" (2016 brochure). Similar claims are made about the other makes and models of the Class Vehicles. GM described the 2014 Sierra as GM's "most dynamic and advanced pickup ever"; the 2014 Silverado as serving as "Your new home on the range"; the 2015 Tahoe as providing "Year-round Comfort" and reflecting "Premium in Every Way"; the 2016 and 2017 Chevrolet Suburbans as "The American icon that has no equal" and "the ideal vehicle for the modern family"; and the 2015 Yukon as being "Professional Grade". These brochures were but a piece of the General Motors' multimedia advertising campaign found on television, radio, the internet and billboards, and newspapers, magazines and other print media. This GM advertising was aimed at convincing potential buyers and lessees the Class Vehicles were premium quality products that included "the most dependable, longest lasting vehicles" on the road, providing "year-round comfort" that would allow the cars to serve as the buyer's "new home on the range." Nothing could have been further from the truth.

62.    Defendants each had actual knowledge they designed, manufactured, marketed and were actively distributing Class Vehicles with a defective air conditioning system that threatened the safety and comfort of those who drove them or rode as passengers in them. On information and belief, Defendants made the knowing and intentional decision not to advise prospective purchasers or lessees of the defects, and

---

(last viewed December 26, 2017). GM could have fixed the air conditioning system while the vehicles were in for repairs to the steering system, transmission, oil cooler line or any of the other reasons for the recalls.

not to notify those who had already bought or leased the Class Vehicles of the problems. GM apparently received numerous complaints about these problems. There were so many complaints that the needed replacement parts took months to obtain. As if this delay was not enough, GM then charged those who needed repairs and were out of warranty for new parts and labor, in essence requiring them to buy, for the second time, a functioning air conditioning system for their vehicles. It was not until November 2017 that, for the first time, General Motors advised some owners of certain Class Vehicles that there "may" be a latent defect in the air conditioning system.

### Class Vehicle Warranties

63.    On information and belief, all Class Vehicles came with a written express warranty from General Motors to the new purchaser. This warranty was entitled "New Vehicle Limited Warranty" and covered the Class Vehicles, "Bumper-to-Bumper" for "the first three years or 36,000 miles, whichever comes first."[19] This warranty applied to "GM vehicles registered in the United States" and covered "repairs to correct any vehicle defect" "related to materials or workmanship occurring during the warranty period." While certain components of the Class Vehicles were excluded from this coverage, the Class Defect was not. The warranty also stated warranty repairs would be done within a "reasonable time".

64.    In November 2017 certain owners of certain Class Vehicles received a letter from General Motors notifying them of a "condition" in their "condenser cooler" where "thermal cycling" "creates a crack that may allow refrigerant to escape." The letter advised

---

[19] Certain vehicle components, such as the powertrain, received longer coverage.

these owners that "General Motors" would provide "additional protection for the condition described above" for 5 years or 60,000 miles, whichever occurs first, in Suburbans, Tahoes and Yukons. For owners of Cadillac Escalades the extension was increased to 6 years or 72,000 miles, whichever occurs first. Silverados and Sierras were not included in this extension. That means owners and lessees of Silverados and Sierras, such as Ronald Gavaldon, did not receive any "warranty extension". Owners of Class Vehicles who did receive an extension and either have suffered or will suffer a failure of their Class Vehicle's air conditioning system due to the Class Defect after the extension period are still forced to pay for the repair cost of replacing the Class Defect and installing new parts. Further, owners and lessees who have not yet suffered a catastrophic failure are driving Class Vehicles with a latent defect in their air conditioning system, leaving the vehicles with a substantially diminished value. Finally, potential customers and lessees are not advised of this latent defect.

### *Plaintiffs' Receipt of the Warranties*

65.     It was not until after they had agreed to purchase their cars that Eric Pitre and Richard Northcutt were given the General Motors' warranty book and advised these were their warranties.[20] There was no negotiation with respect to the warranties, nor was there even an opportunity for Plaintiffs to negotiate the terms or conditions of the warranties with any of the General Motors defendants. At the time of the sale and Plaintiffs' receipt of the General Motors' Limited Warranty, Defendants knew or should have known of the Class Defect and that Plaintiffs and other class members, as lay

---

[20] By the time of his purchase, Richie Ainsworth's vehicle was out of warranty for all relevant purposes.

people, neither were aware of the Class Defect nor did could they detect the problems. Had the Plaintiffs and class members known of the Class Defect they either would not have purchased their Class Vehicle or they would have paid less for the Vehicle.

## RULE 9(b) ALLEGATIONS

66.    Pursuant to the requirements of Rule 9(b), Plaintiffs, both individually and in their capacity as class representatives, adopt all allegations set forth in the preceding paragraphs with respect to fraud.

### *What*

67.    The type of facts omitted and/or hidden by General Motors concern the defects in the air conditioning systems of the Class Vehicles designed, manufactured, marketed, and sold by Defendants. These defects consisted **at least** of both a compressor to condenser line and a condenser of inadequate strength and sturdiness to withstand normal day-to-day operations of the vehicles. These defects created a condition in which the air conditioning system of a Class Vehicle could fail at any moment without any notice to the driver. General Motors should have notified all who had purchased or leased Class Vehicles of these facts, as well as all prospective purchasers and lessees.

### *Why*

68.    The reason the concealment of the defects in the air conditioning system of the Class Vehicles is misleading is because customers are unlikely to purchase a vehicle with known defects, especially ones that could cause the air conditioning system to fail without notice at any moment, when a similar vehicle with a dependable air conditioning system can be bought from a different manufacturer. This makes the reason for the concealment obvious: in a highly competitive market General Motors wanted folks to

purchase or lease GM pickup trucks or SUVs as opposed to buying similar vehicles manufactured by their competitors. The sales of the Class Vehicles are especially important to General Motors, as it is these sales that are driving Defendant General Motors Company's corporate profits.[21] While Plaintiffs do not know the identities of the Defendants' employees who will be able to identify the number of Class Vehicles sold, the average profit for each sold, and what percentage of Defendant General Motors Company's profits come from the sales of Class Vehicles, Defendants do and will easily be able to identify those individuals in discovery.

### How

69.    General Motors' own internal documents and documents showing the original equipment parts are no longer manufactured confirm the existence of latent defects in the air conditioning systems of Class Vehicles. The internal documents also confirm that General Motors long knew about the latent defects yet did not reveal the existence of the Class Defect to those who already owned or were leasing the vehicles. General Motors' concealment from prospective purchasers and lessees has continued since the Class Vehicles have been on the market.

### When and Where

70.    General Motors should have advised owners and lessees of the air conditioning defects as soon as it became aware of them and should have alerted

---

[21] "Analysts say GM makes $10,000 or more on each big SUV and pickup [the Class Vehicles] as people load them out with options." The demand is so great that the factories producing these vehicles are "running full-on, three shifts, to meet demand," according to GM's Chief Financial Officers. Tom Kirsher, *GM Is Motoring as Profit Jumps 34 Pct on US Truck, SUV Sales,* Fox Business, April 28, 2017; http://www.foxbusiness.com/markets/2017/04/28/general-motors-profit-up-34-percent-on-us-truck-suv-sales.html (last viewed January 8, 2018).

prospective owners and lessees to the problem prior to their purchase or lease of the Class Vehicles. Notice of the air conditioning system defects should have been given to owners and lessees in a recall notice or as part of one of the other recall notices issued with respect to these vehicles. Notice of the air conditioning system defects should have been given to prospective owners and lessees in General Motors' advertising, including TV, radio and internet ads as well as brochures for the Class Vehicles. No such notice has been given. It was not until November 2017 that GM advised some current owners about the defects, but it still has not alerted any prospective buyers or lessees to the problems.[22] Not only has GM long-concealed the defect, it has continued to market Class Vehicles in written advertisements as "dependable", "long-lasting", "stronger, smarter and more capable than ever", providing "Year-round Comfort", reflecting "Premium in Every Way", "the ideal vehicle for the modern family" and "Professional Grade".[23]

---

[22] Engineering Information #PIE0340 (Exhibit B) further confirms this deceit. In the opening paragraph of the document GM wrote: "Proceed with this EI ONLY if the customer has commented about this concern AND the PIE number is listed in the Global Warranty Management/Investigative History link (GWM/IVH). If the customer has not commented about this condition or the EI does not show in the GWM/IVH, disregard the PI and proceed with diagnostics found in the published service information. THIS IS NOT A RECALL…" In short, look at the Class Defect only if someone asks about it with specificity, otherwise, ignore them and do not advise customers about the cause.

[23] These only reflect the misrepresentations in GM's brochures. On information and belief there are similar misrepresentations in advertising used through other mediums. *See, e.g.* GM commercial with Howie Long and GM Chief Engineer Eric Stanczak, posted on YouTube on July 5, 2015, and with 404,161 views as of December 26, 2017. In this commercial, Long states, "Everyone knows that Chevy Silverado comes from the family of the most dependable, longest-lasting full-size pickups on the road." https://www.youtube.com/watch?v=tLFe8g7E2sc.

*Who*

71.    Defendants know and can easily ascertain the identity of their employees responsible for designing, testing and evaluating the air conditioning systems prior to the introduction of the Class Vehicles on the market, as well as those who analyzed the system when problems were reported, developed fixes, and made decisions regarding design changes. Plaintiffs do not have the names of these employees, but Defendants know exactly who they are. The same is true for the identity of those who made decisions regarding the marketing of the Class Vehicles and whether to notify owners, lessees and prospective buyers and lessees of the defects.

## CLASS ACTION ALLEGATIONS

*The Proposed Class*

72.    Plaintiffs bring this lawsuit on behalf of themselves and all other similarly situated individuals and business entities pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), 23(b)(3) and/or 23(c)(4). The proposed class includes:

> All persons or entities who purchased or leased a Class Vehicle in the State of Louisiana.

73.    Excluded from this proposed class are (a) Defendants, their affiliates, subsidiaries, successors, predecessors, legal representatives, officers, directors and current or former employees, and any entity in which Defendants have a controlling interest; (b) the Judge and/or Magistrate to whom this case is assigned, and any members of their staff; (c) any person who has suffered personal injuries as a result of the defects in the Class Vehicle air conditioning systems; (d) the Estate or representative of any person who died as a result of the defects in the Class Vehicle air conditioning systems; (e) all federal, state and local governmental entities and agencies; and (f) any person

whose claims against General Motors regarding the issues raised in this lawsuit have already been settled or adjudicated. Plaintiffs reserve the right to amend the definition of the proposed classes if discovery and/or further investigation reveals they should be expanded, divided into further subclasses or modified in any other way.

### Numerosity

74.    Although the exact size of the Class cannot be determined without discovery, Plaintiffs believe over two million Class Vehicles have been sold or leased in the United States.[24] The number[25] sold or leased in Louisiana is undoubtedly significant, given the large number of pickups and full-size SUVS registered here and the percentage of new car sales in Louisiana that are pickups. Joinder of so many potential parties is impractical. In these circumstances disposition of the claims to a single action will provide substantial benefit to all parties and to the Court. On information and belief, Defendants will have records which identify those who purchased and leased Class Vehicles in the state of Louisiana and their contact information.

### Predominance of Common Issues

75.    Common questions of law and/or fact exist as to all members of the Class. These common issues predominate over the questions that might affect individual class members. The common factual and legal issues include, but are not limited to:

---

[24] See footnote 7, *supra.*

[25] Louisiana's percentage of new car sales that are pickups is one of the highest in the country, higher than Texas's 22.6 percent. Terry Box, *Texas Ranks 14th in Pickups' Share of New-Vehicle Sales*, Dallas News (June 2014) at http://www.dallsnews.com/business/business/2014/06/25/texas-ranks-14th-in-pickups-share-of-new-vehicle-sales. (last viewed February 22, 2018).

- Whether there are defect(s) in the air conditioning systems of the Class Vehicles and, if so, the exact nature of the defect(s);

- When General Motors first learned, or should have learned, of the defect(s);

- What steps General Motors took after learning of the defect(s);

- Whether GM developed fixes that cured the air conditioning system of defect(s), the nature of the fixes, when the fixes were developed, when the fixes were deployed and whether the fixes solved the problems with the Class Vehicle air conditioning systems;

- When GM disclosed the existence of the defect(s) in the air conditioning systems to Class Members and, if so, when GM did so and in what fashion;

- If GM did not notify Class Members of the defects, why it failed to do so and whether the failure was knowing or intentional;

- What express and implied warranties applied to the Class Vehicles;

- Whether General Motors breached any express warranties;

- Whether the Class Vehicles were unfit for the ordinary purposes for which they were used;

- Whether GM breached any implied warranties;

- Whether GM engaged in an unconscionable action or course of action;

- Whether GM engaged in "false, misleading or deceptive acts or practices";

- Whether GM represented the Class Vehicles had characteristics, ingredients, uses, or benefits they did not have;

- Whether GM represented that the Class Vehicles were of a particular standard, quality or grade when they were of another;

-37-

- Whether GM knowingly made false or misleading statements of fact concerning the Class Vehicles' need for parts, replacements or repair service;

- Whether Plaintiffs and members of the Class are entitled to equitable relief, including injunctive and/or declaratory relief establishing the Class Vehicles are defective and an order requiring General Motors to notify all Class Members of the defect and to repair the air conditioning systems in all such vehicles without charge;

- Whether Defendants committed fraud or fraudulently concealed the facts about the defect in the air conditioning system of the Class Vehicles; and

- Whether Defendants made a profit from the sale or lease of Class Vehicles and, if so, the amount of that profit.

**Typicality**

76.    Plaintiffs' claims are typical of those claims of the Class, as all class members purchased or leased a Class Vehicle with the defective air conditioning system. The fact issues surround these claims are the result of the conduct of General Motors, including repair costs, future costs of repairs, loss of use and diminished value, among others.

**Adequacy**

77.    Plaintiffs will adequately represent and protect the interest of the Class. None of the Plaintiffs have an interest that conflicts with the interest of the Class. Plaintiffs have retained counsel with substantial experience in both prosecuting class actions and in prosecuting claims against auto manufacturers for vehicle defects. Plaintiffs and their counsel are committed to vigorous prosecution of these claims and have the financial wherewithal to do so.

*Superiority*

78.    A class action is the best means for a fair and efficient adjudication of the claims of Plaintiffs and the members of any Class. The Plaintiffs and members of the Classes have all suffered injuries due to Defendants' conduct. Given the size of the injury and the expense of prosecuting a claim involving defects in vehicles, it is highly unlikely individual class members would be able to redress the wrongs set out in this pleading. Even if individual Class members could do so, there would potentially be hundreds, or thousands of lawsuits filed around the country, clogging the courts and posing the risk of inconsistent or contradictory judgments. Further, from the Defendants' perspective, hundreds, or thousands of individual cases around the state would require Defendants to produce for deposition certain employees hundreds, or thousands of times, and address repetitive document productions and discovery disputes with potentially inconsistent rulings. A class action allows for efficient adjudication of the common fact and legal issues presented in this case in a manner that is fair to all.

## CAUSES OF ACTION

### CAUSE OF ACTION NUMBER 1
### VIOLATION OF WARRANTY AGAINST REDHIBITORY DEFECTS
#### (On behalf of Plaintiffs and the Class)

79.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

80.    Defendants were responsible for the design, manufacture, assembly, marketing and distribution of the Class Vehicles with the Class Defect and placed these vehicles in the stream of commerce for sale in Louisiana. At the time the Class Vehicles left the possession of Defendants they contained the Class Defect. As the manufacturer

of the Class Vehicles, Defendants are deemed to have known the Class Vehicles possessed a redhibitory defect.

81.    The Class Defect is a hidden defect that was present at the time of the manufacture of each Class Vehicle. It could not be detected by a reasonable inspection performed by the purchaser of the Class Vehicle.

82.    The Class Defect is a vice or defect that renders the Class Vehicles so inconvenient to use that Plaintiff and all other class members would either not have purchased their Class Vehicle or they would have paid significantly less for the purchase of them.

83.    Under LSA-C.C. Article 2520 and subsequent court interpretations the manufacturer of the Class Vehicles warrants buyers against redhibitory defects or vices in Class Vehicles that existed at the time of the manufacture of the vehicles. Pursuant to Article 2520, Plaintiff and Class Members are entitled to recession of their purchase of the Class Vehicles.

84.    Alternatively, the Class Defect constitutes a redhibitory defect in the Class Vehicles that diminished the value of the Class Vehicles at the time of purchase and currently such that it must be presumed Plaintiff and class members would have paid less for the purchase of their Class Vehicle. In this instance Plaintiff and class members are entitled to a reduction in their purchase price.

85.    As a direct and proximate result of each Defendants' violation of the warranty against redhibitory defects, Plaintiffs and the other class members have suffered injury in fact and lost money. Each Defendant's breach of warranty resulted in the following damages to Plaintiffs and the class members:

- Expenditure of monies to repair the Class Defect in the Class Vehicles;

- Loss of use of the Class Vehicles while the Class Defect was being repaired and/or replaced;

- Aggravation of driving without a functioning air conditioning system while waiting for repairs to be made;

- The purchase or lease of Class Vehicles they would not have purchased or leased had they known of the Class Defect;

- Overpaying for the Class Vehicles they did purchase or lease, as a vehicle with a Class Defect is worth less than the same exact vehicle without the defect; and

- Diminution in value of their Class Vehicle, as a vehicle today with a Class Defect is worth less than the same exact vehicle without the defect.

86.    Plaintiffs and the class members are entitled to legal relief against each Defendant, jointly and severally, including recovery of actual damages, attorney's fees, costs of suit, and such further relief as the Court may deem proper.

### CAUSE OF ACTION NUMBER 2
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (On behalf of Plaintiffs and the Class)

87.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all prior allegations contained in this pleading.

88.    Plaintiffs and all other class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C.§2301(3).

89.    Defendants are "suppliers" and Defendant General Motors, LLC is a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C.§2301(4) and (5).

90.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C.§2301(1).

91.    Defendant General Motors, LLC's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C.§2301(6). They were provided directly to Plaintiffs and other members of the proposed class at the time each purchased their Class Vehicle, and thus Plaintiffs and the other class members are clearly the intended beneficiaries of the warranties.

92.    The amount in controversy of each Plaintiffs' individual claim exceeds $25.00, and the amount in controversy of this action exceeds $50,000.00, exclusive of interest and costs, computed based on all the claims to be determined in this action.

93.    If named as class representatives, Plaintiffs will notify Defendants of their status and that they are acting on behalf of the whole class and provide Defendants a reasonable opportunity to cure their breach of express warranty for the whole class.

94.    Defendants breached the express warranties issued, as described in detail above. Any time and mileage limitations on the express warranties are unconscionable under Louisiana law for several reasons. First, the Defendants advertisements and representations in those advertisements regarding the qualities of the Class Vehicles, including their reliability, durability, dependability and long-life, are declarations about the qualities of the Class Vehicles Defendants knew the Class Vehicles did not have. Second, Defendants knew or should have known of the existence of the Class Defect in the Class Vehicles from the time these vehicles were introduced on the market. Defendants knew or should have known Plaintiffs and other class members not only did not know of the Class Defects, but that there was no reasonable way for them to discover the Class Defects prior to the purchase or lease of the Class Vehicles. Third, such time and mileage limitations are unreasonable in the circumstances of this case given the complete

imbalance of bargaining power and the fact that the warranties were provided by General Motors, LLC, without any room for negotiation. Finally, any time or durational limitations on the express warranties are procedurally and substantively unconscionable under Louisiana and federal law. Thus, any time and mileage limitations on the express warranties should not be considered in determining whether express warranties arise under Louisiana state law from the "New Vehicle Limited Warranty", and whether Plaintiff and those similarly situated have claims under the Magnuson-Moss Warranty Act for breach of those warranties.

95.    The Defendants also breached the Louisiana warranty against redhibitory defects. This warranty and its breach by Defendants also gives rise to a cause of action for breach of implied warranty under the Magnusson-Moss Warranty Act. To the extent there has been any effort to waive the warranty against redhibitory defects, that effort fails for the reasons set out in the paragraph above.

96.    Defendants' breach of the express and implied warranties as described above has damaged Plaintiffs. Pursuant to the Magnusson-Moss Warranty Act, 15 U.S.C. §2310(d)(1) Plaintiffs, on behalf of class members, bring this claim for both damages and equitable relief.

97.    As a direct and proximate result of each Defendants' breach of warranty, Plaintiffs and the other class members suffered injury in fact and lost money. Each Defendants' breach of warranty resulted in the following damages to Plaintiffs and the Class Members:

- Expenditure of monies to repair the Class Defect in the Class Vehicles;

- Loss of use of the Class Vehicles while the Class Defect was being repaired and/or replaced;

- Aggravation of driving without a functioning air conditioning system while waiting for repairs to be made;

- The purchase or lease of Class Vehicles they would not have purchased or leased had they known of the Class Defect;

- Overpaying for the Class Vehicles they did purchase or lease, as a vehicle with a Class Defect is worth less than the same exact vehicle without the defect; and

- Diminution in value of their Class Vehicle, as a vehicle today with a Class Defect is worth less than the same exact vehicle without the defect.

98.    Plaintiffs and the class members are entitled to legal relief against each Defendant, jointly and severally, including recovery of actual damages, attorney's fees, costs of suit, and such further relief as the Court may deem proper.

99.    Plaintiffs and the class members are also entitled to injunctive relief pursuant to 15 U.S.C. §2310(d)(1) in the form of an order prohibiting each Defendant from engaging in the alleged misconduct set out above and requiring Defendants to repair and eliminate the Class Defects in the Class Vehicles within a reasonable time at no cost to the class members, to agree to repair the defects in the Class Vehicles at any time in the life of the Class Vehicles at no cost to the class members, and for such other equitable relief as the Court deems appropriate, including, but not limited to, disgorgement, for the benefit of the class members, of all or part of the ill-gotten profits Defendants have received from their failure to disclose the Class Defect in the Class Vehicle's air conditioning systems.

### CAUSE OF ACTION NUMBER 3
### FRAUD
### (On behalf of Plaintiffs and the Class)

100.    Plaintiffs, individually and on behalf of the Class, incorporate by reference all prior allegations contained in this pleading.

101.    Plaintiffs brings this cause of action on behalf of themselves and all Class members.

102.    Defendants, as detailed above, have misrepresented or suppressed the truth regarding the Class Defect in the Class Vehicles with the intent to gain an unjust advantage in any purchase of one of Defendants' cars. Defendants knew or should have known that had consumers been aware of the Class Defect in the Class Vehicles, the consumers either would have purchased vehicles made by a different car manufacturer or would have paid significantly less for their Class Vehicle. This misrepresentation and suppression has occurred both by actions taken by Defendants as well as the silence and/or inaction of the Defendants. Had Plaintiffs and other Class Members known of the Class Defect in the Class Vehicles, they would either have purchased and/or leased a different manufacturer's vehicle, or they would have paid less for their purchase or lease of the Class Vehicles.

103.    As a direct and proximate result of each Defendant's fraud, as that term is defined by Louisiana Civil Code article 1953, Plaintiffs and the other class members suffered injury in fact and lost money. Each Defendant's breach of warranty resulted in the following damages to Plaintiffs and the Class Members:

- Expenditure of monies to repair the Class Defect in the Class Vehicles;

- Loss of use of the Class Vehicles while the Class Defect was being repaired and/or replaced;

- Aggravation of driving without a functioning air conditioning system while waiting for repairs to be made;

- The purchase or lease of Class Vehicles they would not have purchased or leased had they known of the Class Defect;

- Overpaying for the Class Vehicles they did purchase or lease, as a vehicle with a Class Defect is worth less than the same exact vehicle without the defect; and

- Diminution in value of their Class Vehicle, as a vehicle today with a Class Defect is worth less than the same exact vehicle without the defect.

### ANY APPLICABLE PRESCRIPTIVE PERIOD IS TOLLED

104.    To the extent Defendants might assert any claim made by any Plaintiff or member of any class has prescribed, Plaintiffs and all Class Members would show that the doctrine of *contra non valentem* applies.

105.    As set out in this pleading, the Class Vehicles have defects in their air conditioning systems. These defects, which can be objectively verified, are hidden from buyers and lessees, cannot reasonably be discovered by consumers and do not manifest themselves until an air conditioning system failure occurs. Plaintiffs and class members were unaware of the Class Defect when they purchased their Class Vehicle, even though they exercised due diligence prior to purchasing or leasing the Class Vehicles in trying to make sure the air conditioning system worked properly. Defendants engaged in affirmative conduct to try to lead a reasonable person to believe no Class Defect existed. As described above, they advertised the Class Vehicles as being well-engineered, durable, reliable and dependable, and provided that air conditioning was standard on the Class Vehicles. They failed to disclose the existence of the Class Defect for years, and in

their technical service bulletins and Engineering Instructions instructed dealers not to mention these issues when Class Vehicles were brought in for repair.

106.    Even when the air conditioning system fails, the Plaintiffs and Class Members were never advised by Defendants that the failure was due to an inherent defect in the air conditioning system of the Class Vehicles, leaving Plaintiffs and Class Members whose system have failed thinking they were just the victims of bad luck. Plaintiffs and Class Members could not reasonably have known of the existence of any potential cause of action until late 2017 at the earliest.

107.    As for those Plaintiffs and Class Members whose air conditioning systems have not yet failed, they have no reason to know or believe their Class Vehicles have an air conditioning defect and Defendants made the knowing decision not reveal that defect to them until November 2017, at which time it only revealed the "condition" to certain owners of certain Class Vehicles.

108.    Given the documentary evidence, the November 2017 letter sent by General Motors to certain owners of certain Class Vehicles and the fact that, on information and belief, Defendants have been aware of the defects in the air conditioning systems of the Class Vehicles since the first release of the Class Vehicles, Defendants have not only failed to reveal to Plaintiffs and Class Members the existence of the Class Defect but, on information and belief, have actively concealed its existence. Instead, Defendants have engaged in affirmative conduct that would lead a reasonable person to believe no Class Defect existed.

109.    Any potentially applicable prescriptive period has been tolled by Defendants' conduct and the doctrine of *contra non valentem*.

**JURY DEMAND**

110.    Plaintiffs and Class Members demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

**PRAYER FOR RELIEF**

111.    WHEREFORE, Plaintiffs, on behalf of themselves and all other members of the Class, request that citation be issued and served upon Defendants in the form and manner prescribed by law, requiring that Defendants appear and answer herein; and that upon final hearing hereon, Plaintiffs have judgment against Defendants jointly and severally for the following:

- An order determining the causes of action alleged may be maintained as a class action, certifying one or more of the proposed classes, designating Plaintiffs as named representatives of the class or classes and designating the undersigned counsel as Class counsel;

- A declaration that the air conditioning systems in the Class Vehicles are defective;

- An order requiring Defendants, at their own cost, to notify all class members of the Class Vehicle defects;

- An order requiring Defendants to repair and eliminate the Class Defects in the Class Vehicles within a reasonable time at no cost to the class members, and to agree to repair the defects in the Class Vehicles at any time in the life of the Class Vehicles at no cost to the class members;

- An order requiring Defendants to provide class members a vehicle of the same size and quality as the Class Vehicle any time a Class Vehicle is brought in for the repair of a Class Defect;

- An award of all actual, special, incidental, punitive and statutory damages to which Plaintiffs and all Class Members are entitled, including all profits Defendants received as a result of the sale or lease of the Class Vehicles;

- An award to Plaintiffs and the class members restitution, disgorgement of profits, rescission and/or any other equitable remedy to which they are entitled;

- An award of reasonable attorney's fees and costs to counsel for Plaintiffs and the class members;

- Pre-judgment and post-judgment interest as allowed by law; and

- An award of all such other relief, at law or in equity, to which Plaintiffs and Class Members may be justly entitled.

Respectfully submitted,

*/s/ C. Arlen Braud, II*
**C. ARLEN BRAUD, II, #20719**
**MICHELLE O. GALLAGHER, #23886**
**STEVEN D. JACKSON, #35841**
BRAUD & GALLAGHER, L.L.C.
111 N. Causeway Blvd., Ste. 201
Mandeville, Louisiana 70448
Telephone: (985) 778-0771
Facsimile: (985) 231-4663
arlenb@braudandgallagher.com
michelleg@braudandgallagher.com
stevenj@braudandgallagher.com

Richard Schechter
SBOT No. 17735500
richard@rs-law.com
LAW OFFICE OF RICHARD SCHECHTER, P.C.
One Greenway Plaza, Suite 740
Houston, Texas 77046-0102
Telephone: (713) 623-8919
Facsimile: (713) 622-1680

Charles Clinton Hunter
SBOT No. 24072160
chunter@reichandbinstock.com
Dennis C. Reich
SBOT No. 16739600
dreich@reichandbinstock.com
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, Texas 77027
Telephone: (281) 768-4731
Facsimile: (713) 623-8724

-49-

Ernest "Bo" Hopmann, III
SBOT No. 09982800
bhopmann@pdq.net
LAW OFFICE OF ERNEST O. HOPMANN, III
3700 N. Main Street
Houston, Texas 77009
Telephone: (713) 869-9252
Facsimile: (713) 869-8859

**ATTORNEYS FOR PLAINTIFFS**

**TO BE SERVED VIA SUMMONS**

**GENERAL MOTORS COMPANY**
Through its registered agent:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**GENERAL MOTORS HOLDINGS, LLC**
Through its registered agent:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**GENERAL MOTORS, LLC**
Through its registered agent:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802